ACCEPTED
15-25-00012-cv
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
5/7/2025 3:14 PM
CHRISTOPHER A. PRINE
CLERK

# NO. 15-25-00012-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
5/7/2025 3:14:35 PM
CHRISTOPHER A. PRINE
Clerk

IN THE COURT OF APPEALS
FOR THE FIFTHTEENTH DISTRICT OF TEXAS

**State of Texas, acting by and through the Texas Facilities Commission, for and on behalf of the Texas Health and Human Services Commission; The Texas Facilities Commission; Mike Novak, in his Official Capacity as Executive Director of the Texas Facilities Commission; The Texas Health and Human Services Commission; and Rolland Niles in his Official Capacity as Deputy Executive Commissioner for the System Support Services Division of the Texas Health and Human Services Commission ,**

*Appellants,*

*v.*

*8317 Cross Park, LLC,*

*Appellee.*

## BRIEF OF APPELLEE 8317 CROSS PARK LLC

On Interlocutory Appeal from the 98 District Court
of Travis County, Texas

R. Kemp Kasling
State Bar No. 11104800
Law Offices of R. Kemp Kasling
5806 Mesa Drive, Suite 300
Austin, Texas 78731
Telephone: (512) 472-6800
Facsimile: (512) 472-6823
Email: kkasling@kaslinglaw.com

CARDWELL, HART & BENNETT, LLP
J. Bruce Bennett
State Bar No. 02145500
807 Brazos, Suite 1001
Austin, Texas 78701
Telephone: 512-322-0011
Facsimile: 512-322-0808
jbb.chblaw@me.com

ATTORNEYS FOR APPELLEE 8317 CROSS PARK, LLC

**ORAL ARGUMENT NOT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

Appellants:

State of Texas, acting by and through the Texas Facilities Commission, for and on behalf of the Texas Health and Human Services Commission; The Texas Facilities Commission; Mike Novak, in his Official Capacity as Executive Director of the Texas Facilities Commission; The Texas Health and Human Services Commission; and Rolland Niles in his Official Capacity as Deputy Executive Commissioner for the System Support Services Division of the Texas Health and Human Services Commission.

Represented by:

JENNIFER COOK
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548/Mail Stop 019-1
Austin, Texas 78711-2548
Tel: (512) 475-4098
Fax: (512) 302-0667
jennifer.cook@oag.texas.gov

Appellee:

**8317 Cross Park, LLC**

Represented by:

R. Kemp Kasling
Law Offices of R. Kemp Kasling, P.C.
5806 Mesa Drive, Suite 330
Austin, Texas 78731
Tel. (512) 472-6800
Fax. (512) 472-6823
kkasling@kaslinglaw.com
(Trial and Appellate Counsel)

J. Bruce Bennett
CARDWELL, HART & BENNETT, L.L.P.
807 Brazos, Suite 1001
Austin, Texas 78701
Tel. (512) 322-0011
jbb.chblaw@me.com
(Appellate Counsel)

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL........................................................2

TABLE OF CONTENTS ...................................................................................3

INDEX OF AUTHORITIES..............................................................................6

STATEMENT OF THE CASE..........................................................................11

STATEMENT REGARDING ORAL ARGUMENT.........................................11

ISSUES PRESENTED.....................................................................................11

    1. Did the trial court correctly conclude that the waiver of immunity from suit in Chapter 114 of the Tex. Civ. Prac. & Rem. Code covers Cross Parks' claims against Appellants the State of Texas, the Texas Facilities Commission, and the Texas Health and Human Services Commission? ...................................11

    2. Did the trial court correctly conclude that Cross Park stated a viable ultra vires claim against Appellant Mike Novak in his official capacity as Executive Director of the Texas Facilities Commission?..............................................11

    3. Did the trial court correctly conclude that Cross Park stated a viable *ultra vires* claim against Appellant Rolland Niles in his official capacity as Deputy Executive Director of the Texas Health and Human Services Commission? 12

STATEMENT OF FACTS .................................................................................12

I.    The Cross Park Lease ..........................................................................12

II.   The Legislature appropriates funds to HHSC for fiscal years 2024 and 2025 to pay the rent on leased space that HHSC occupies .........................................15

III.  The proceedings below .......................................................................19

SUMMARY OF THE ARGUMENT ................................................................19

BRIEF OF ARGUMENT..................................................................................20

ARGUMENT AND AUTHORITIES UNDER ALL ISSUES ..................................20

I.    Standard of review ................................................................................20

II.   Cross Park pleaded and produced evidence showing a valid waiver of immunity from suit ............................................................................22

    A. Chapter 114 waives Appellants' immunity from Cross Park's suit ........22

    B. Cross Park's contract is within the scope of Chapter 114 .......................26

III.   Sovereign Immunity does not bar Cross Park's UDJA claims ..........................32

IV.   Cross Park's *ultra vires* claims against Novak and Niles are not barred by sovereign immunity ..............................................................................34

    A. Novak and Niles acted without and contrary to legal authority and failed to perform ministerial acts .................................................................35

        1. The termination procedures of the Lease and applicable law ............35

        2. Novak's conduct was *ultra vires* ......................................................37

        3. Niles's conduct was *ultra vires* .......................................................41

    B. Niles had no discretion to refuse to comply with the mandated termination procedures or to divert money appropriated for rent to "different purposes." ............................................................................44

        1. Novak's and Niles's limited discretion, if any, does not bar the *ultra vires* claim against them ....................................................................49

        2. Forward-looking injunctive relief is proper to address past wrongs ....51

        3. Injunctive and mandamus relief may require the payment of money 52

CONCLUSION AND PRAYER ........................................................................54

CERTIFICATE OF COMPLIANCE .................................................................55

CERTIFICATE OF SERVICE ...............................................................55

APPENDIX ........................................................................................56

# INDEX OF AUTHORITIES

**Cases**

*Acker v. Texas Water Comm'n*, 790 S.W.2d 299 (Tex.1990) ................................... 23

*Anderson v. City of Seven Points*, 806 S.W.2d 791 (Tex.1991) ...................... 35, 46

*Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v.*
*Tex. Political Subdivisions Prop./Cas. Joint Self-Ins. Fund,*
212 S.W.3d 320 (Tex.2006) .................................................................. 33

*Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547 (Tex.2000) ................................ 21

*Campbellton Rd., Ltd. v. City of San Antonio by & through San Antonio Water Sys.,*
688 S.W.3d 105 (Tex.2024) .................................................... 28, 30, 31

*Carpenter v. Sheppard*, 145 S.W.2d 562 (Tex. 1940) ........................................ 53

*Charles Scribner's Sons v. Marrs*, 262 S.W. 722 (Tex. 1924) .................... 46, 49

*City of Cleburne v. RT Gen., LLC*, No. 10-20-00037-CV,
2020 WL 7394519 (Tex. App.—Waco Dec. 16, 2020, no pet.) (mem. op.) ........... 34

*City of El Paso v. Heinrich*, 284 S.W.3d 366 (Tex.2009) ................................... 53

*City of Round Rock v. Whiteaker*, 241 S.W.3d 609
(Tex.App.—Austin 2007, pet. denied) ................................................... 34

*Clear Lake City Water Auth. v. Kirby Lane Development,*
123 S.W.3d 735 (Tex.App.—Houston [14th Dist.] 2003, pet. denied) ................. 47

*Cobb v. Harrington*, 190 S.W.2d 709 (Tex.1945) ............................................ 34

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909 (Tex.2013) .... 26

*Crouch v. Stanley*, 390 S.W.2d 795
(Tex.Civ.App.—Eastland 1965, writ ref'd n.r.e.) ..................................... 25

*Fraley v. Tex. A&M Univ. Sys.*, 664 S.W.3d 91 (Tex. 2023) ............................. 21

*Hartzell v. S.O.*, 672 S.W.3d 304 (Tex.2023)..................................................34, 35, 51

*Herring v. Houston Nat. Exch. Bank*, 269 S.W. 1031 (Tex.1925)...........................24

*Hoppenstein Props., Inc. v. McLennan Cnty. Appraisal Dist.*,
341 S.W.3d 16 (Tex.App.—Waco 2010, pet. denied)..................................29, 30, 31

*Houston Belt & Terminal Ry. Co. v. City of Hous.*, 487 S.W.3d 154
(Tex.2016)..........................................................................................46, 49, 50

*In re Williams*, 470 S.W.3d 819 (Tex. 2015).........................................................46

*Jessen Assocs., Inc. v. Bullock*, 531 S.W.2d 593 (Tex. 1975) ...........................52, 52

*Jernigan v. Finley*, 38 S.W. 24 (Tex.1896)..........................................................25

*Knight v. Chicago Corp.*, 183 S.W.2d 666
(Tex.Civ.App.—San Antonio 1944), *aff'd*, 188 S.W.2d 564 (Tex.1945)...............48

*Laidlaw Bros. v. Marrs*, 273 S.W. 789 (Tex.1925) .....................................45, 47, 48

*Lowe v. Texas Tech Univ.*, 540 S.W.2d 297 (Tex.1976) .......................................22

*Lubbock County. Water Control & Imp. Dist. v. Church & Akin, L.L.C.*,
442 S.W.3d 297 (Tex.2014)..................................................................28, 29

*Members of the Board of Regents v. Hilley*, No. 05-93-01729-CV,
1994 WL 708295 (Tex.App.—Dallas Dec. 21, 1994, writ denied)
(not designated for publication) ......................................................................25

*Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69 (Tex.2015) ..........52

*Pepper Lawson Horizon Int'l Group, LLC v. Tex. S. Univ.*,
669 S.W.3d 205 (Tex.2023)..................................................................21, 31

*Port Arthur Community Action Network v. Tex. Comm'n on Env't Quality*,
707 S.W.3d 102 (Tex.2025)..........................................................................37

*Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927 (Tex.2010)..........................31

*Rodriguez v. Service Lloyds Ins.,* 997 S.W.2d 248 (Tex.1999) ..............................37

*Sampson v. University of Texas at Austin,* 500 S.W.3d 380 (Tex.2016) ................24

*State v. 1165 Airport Boulevard Office Building, Ltd.,*
212 S.W.3d 610 (Tex.App.—Austin 2006, no pet.) ..................................34

*State v. City Nat'l Bank,* 578 S.W.2d 155 (Tex.Civ.App.—Tyler 1979),
aff'd, 603 S.W.2d 764 (Tex.1980) ..................................45

*State v. Epperson,* 42 S.W.2d 228 (Tex.1931)..................................47

*Sw. Bell Tel., L.P. v. Emmett,* 459 S.W.3d 578 (Tex.2015) ..................................52

*Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440 (Tex.1993) ................21

*Tex. Dep't of Criminal Justice v. Rangel,* 595 S.W.3d 198 (Tex.2020)................21

*Tex. Tel. Ass'n v. Pub. Util. Comm'n of Tex.,* 653 S.W.3d 227
(Tex.App.—Austin 2022, no pet.) ..................................49, 51

*Thompson v. Baker,* 38 S.W. 21 (Tex.1896)..................................26

*Town of Shady Shores v. Swanson,* 590 S.W.3d 544 (Tex.2019) ............................21

*United States v. Gaubert,* 499 U.S. 315 (1991)..................................41

*Womack v. Berry,* 291 S.W.2d 677 (Tex.1956) ..................................25

**Statutes**

Texas Civil Practice & Remedies Code
§ 114.001(2)..................................22, 24, 26
§ 114.002..................................24, 26
§ 114.003..................................24, 26

Texas Government Code
§ 317.002(b) ..................................46
§ 2151.003(1)(B)-(D)..................................23
§ 2151.004(c) ..................................23

§ 2165.105(b) ...........................................................................................23
§ 2167.101................................................................................................39
§ 2167.002(a) ............................................................................................23
§ 2167.0021 ..............................................................................................41
§ 2167.055(a) ............................................................................................22
§ 2167.055(e) ......................................................................................16, 36
§ 2167.055(f).............................................................................................23
§ 2167.101................................................................................................39

Texas Local Government Code

Chapter 271 ....................................................................................30, 31, 34

**Session Laws**

Acts 2023, 88th Leg. R.S, H.B. 1, General Appropriates Act .....................16, 32, 43
Acts 2013, 83rd Leg., R.S., Ch. 1260 (H.B. 586, eff. September 1, 2013)..............24

**Texas Attorney General Opinions**

Op. Tex. Att'y Gen. No. C-21 (1963) ...............................................................45
Op. Tex. Att'y Gen. No. O-5545 (1943)............................................................45
Op. Tex. Att'y Gen. No. M-1191 (1972) ...........................................................46
Op. Tex. Att'y Gen. No. H-207 (1974).............................................................46

**Texas Facilities Commission Regulations**

1 T.A.C. § 115.21(a) .............................................................................18, 36
1 T.A.C. § 115.21(b)..................................................................................36
1 T.A.C. § 115.22(b)..................................................................................36
1 T.A.C. § 115.22(c) .............................................................................36, 41

**Texas Register**

41 Tex. Reg. 7709 (2016) ............................................................................37

**Texas Rules of Appellate Procedure**

Rule 9.4 .................................................................................................55

**Texas Rules of Evidence**

Rule 201 ............................................................................................20

**Legislative History of H.B. 586, 83rd Tex. Leg. (R.S.) 2013**

House Comm. on Judiciary & Civil Justice, Committee Hearing
of April 8, 2013 .............................................................................. 324

Senate Comm. on State Affairs, Committee Hearing of May 16, 2013 .................. 24

## STATEMENT OF THE CASE

This appeal concerns Appellants' attempt to escape the consequences of their unlawful effort to terminate a state lease providing construction services to a state agency. The 455th District Court of Travis County (Eiserloh, J.) denied the plea to the jurisdiction of Appellants following an evidentiary hearing.[1] (CR 1121-1122).[2]

## STATEMENT REGARDING ORAL ARGUMENT

Cross Park does not believe that oral argument would be of material assistance to the Court. The governing law is clear and straightforward and the relevant facts are set forth in the parties' briefing. If, however, the Court wishes to hear oral argument, then counsel for Cross Park requests the opportunity to participate.

## ISSUES PRESENTED

1      Did the trial court correctly conclude that the waiver of immunity from suit in Chapter 114 of the Tex. Civ. Prac. & Rem. Code covers Cross Parks' claims against Appellants the State of Texas, the Texas Facilities Commission, and the Texas Health and Human Services Commission?

2.      Did the trial court correctly conclude that Cross Park has stated a viable

---

[1] The trial court granted the pleas to the jurisdiction of Defendant Cecile Erwin Young in her Official Capacity as Executive Commissioner of Appellant Texas Health and Human Services Commission and of Glenn Heger, Texas Comptroller of Public Accounts. Cross Park has not appealed the granting of these pleas.

[2] References to the Clerk's Record will be to "(CR [Page __])" and references to Volume 2 of the Reporter's Record will be to "(2 RR [PDF Page #])."

11

ultra vires claim against Appellant Mike Novak in his official capacity as Executive Director of the Texas Facilities Commission?

3.     Did the trial court correctly conclude that Cross Park has stated a viable *ultra vires* claim against Appellant Rolland Niles in his official capacity as Deputy Executive Director of the Texas Health and Human Services Commission?

## STATEMENT OF FACTS

### I.     The Cross Park Lease.

In December 2001, Appellant, the State of Texas ("the State"), acting by and through the Texas General Services Commission, now known as Appellant Texas Facilities Commission ("TFC"), entered into a State Lease (the "Cross Park Lease" or "the Lease") with Dupont Cross Park Drive Limited Partnership ("Dupont"). (2 RR, Ex. P-008, Ex. 1 [PDF 2015]). In January 2020, Cross Park became the successor in interest to Dupont as lessor under the Lease. (2 RR, Ex. P-008 [PDF 2013]).

The Lease concerns premises located at 8317 Cross Park Drive in Austin, Texas (the "Leased Premises"). (2 RR, Ex. P008, Ex. 1 [PDF 2015]). Until March 2023, the Leased Premises were occupied in whole or in part by Appellant Texas Health and Human Services Commission ("HHSC"). (2 RR, Ex. P-003 [PDF 2071-2072]).

The Lease requires the landlord to provide substantial construction and other services to the tenant. Paragraph 5(a) of the Lease states: "The Lessor . . . shall also

12

furnish *any and all services provided in this lease*." Paragraph 5(b) then states:

> "Lessor covenants and agrees . . . to keep the leased premises, property and buildings in good repair and condition during the continuance for the term of this lease, said maintenance to include but is not limited to, the following services: Repair and patch wall, ceiling and floor surfaces; paint as needed; replacement of broken window glass; repair of window shades, blinds and/or drapes, fasteners and sash cord or chains; roof and ceiling leaks; building exterior, interior; plumbing, heating, air conditioning and ventilating equipment; fire protection equipment; miscellaneous valves; woodwork, locks, floor surfaces and coverings; lighting fixtures, and the replacement of all defective or burned-light bulbs, fluorescent tubes, ballasts and starters." (2 RR, Ex. P-001 [PDF 2016]).

The Lease commenced on September 1, 2002, and was for an initial term of 60 months. (RR, Ex. P008, Ex. 1 [PDF 2015]). However, the Lease has been extended, modified, and supplemented multiple times.

In 2016, the Lease was amended three times to increase the amount of usable space. Each amendment required the lessor to engage in construction work in the form of upgrades, repairs, and alterations for the occupying state agencies, which included HHSC. (2 RR, Ex. P-008, Ex. 5 [PDF 2249], Ex. 6 [PDF 2252], Ex. 7 [PDF 2256]). All other terms and conditions of the Lease remained the same.

In 2018, the Lease was renewed and extended to September 1, 2028. (2 RR, Ex. P-008, Ex. 8 [PDF 2260]). The amendment provided that the portion of the Lease covering "Training Space" could not be canceled before February 28, 2021, and that the portion of the Lease for "HHSC Space" could not be canceled before November 30, 2025. (*Id.* [PDF 2261]). In the amendment, the Lessor agreed, "[a]t Lessor's

13

expense," to make upgrades to the Leased Premises. (*Id.*). All other terms and conditions of the Lease remained the same and "continue in full force and effect." (*Id.* [PDF 2262]).

The last amendment to the Lease occurred in 2020, after the TFC confirmed the validity of the Cross Park Lease. (2 RR, Ex. P-001 [PDF 2007], P-008, Ex. 9 [PDF 2264]). This amendment provided that the portions of the Lease covering "Training Space" and "HHSC Space" could not be canceled before November 30, 2025. (*Id.* [PDF 2265]). The amendment also provided:

> "At Lessor's sole expense, the Lessor agrees to make upgrades to the leased premises to reconfigure the space at the direction of HHSC to reflect standard State modular and hard walled office configurations. Preliminary estimates of the scope of work are approximately $50,000.00 but in no event shall exceed $75,000.00. Work shall be completed in coordination and written approval of HHSC." (*Id.*).

The amendment also provides that "[a]ll other terms and conditions of the Lease remain the same and continue in full force and effect." (*Id.* [PDF 2266]).

The grounds and procedure for terminating the Cross Park Lease are set out in Paragraph 4 (b) of the Lease:

> "This lease contract is made and entered into in accordance with the provisions of Texas Government Code, Title 10, Subtitle D, and is made contingent upon the continuation of federally funded programs, or upon the availability of state funds appropriated by the Legislature, to cover the full term and cost of this lease. In the event a curtailment of federally funded programs occurs, or in the event state appropriated funds are unavailable, the General Services Commission, hereinafter referred to the Commission, may assign another State agency to the space, or a part thereof, covered by this lease. Should the Commission

14

be unable to find another State agency or agencies to fill, or partially fill the space, the Commission, upon written notice to the Lessor, either may terminate this lease, or adjust it in accordance with the provisions of this lease." (2 RR, Ex. P-001 [PDF 2015]).

**II.     The Legislature appropriates funds to HHSC for fiscal years 2024 and 2025 to pay the rent on leased space that HHSC occupies.**

On September 9, 2022, HHSC submitted its Legislative Appropriations Request for the 2024-2025 biennium. (2 RR, Ex. P-009 [PDF 65]). HHSC requested $105,369,343 for "RENT – BUILDING" for fiscal year 2024 and $105,245,466 for "RENT – BUILDING" for fiscal year 2025:

| 2.C. Summary of Base Request by Object of Expense 88th Regular Session, Agency Submission, Version 1 Automated Budget and Evaluation System of Texas (ABEST) | | | | 9/9/2022 11:53:48AM | |
|---|---|---|---|---|---|
| **529  Health and Human Services Commission** | | | | | |
| OBJECT OF EXPENSE | Exp 2021 | Est 2022 | Bud 2023 | BL 2024 | BL 2025 |
| 1001  SALARIES AND WAGES | $1,620,861,662 | $1,663,374,485 | $1,737,701,896 | $1,708,014,731 | $1,709,586,718 |
| 1002  OTHER PERSONNEL COSTS | $97,632,746 | $71,203,012 | $67,733,701 | $66,486,160 | $66,491,576 |
| 2001  PROFESSIONAL FEES AND SERVICES | $1,136,137,558 | $1,332,306,058 | $1,235,340,503 | $1,312,180,044 | $1,366,013,813 |
| 2002  FUELS AND LUBRICANTS | $1,714,460 | $1,408,127 | $1,409,829 | $1,399,499 | $1,399,499 |
| 2003  CONSUMABLE SUPPLIES | $20,341,030 | $11,331,932 | $11,157,861 | $11,138,592 | $11,138,592 |
| 2004  UTILITIES | $40,504,822 | $43,406,801 | $45,113,910 | $44,373,455 | $44,373,455 |
| 2005  TRAVEL | $8,645,109 | $19,976,532 | $26,535,366 | $27,735,103 | $27,136,821 |
| 2006  RENT - BUILDING | $116,605,305 | $110,460,578 | $110,054,452 | $105,369,343 | $105,245,466 |
| 2007  RENT - MACHINE AND OTHER | $43,819,077 | $24,980,649 | $27,164,323 | $24,569,481 | $24,569,481 |
| 2009  OTHER OPERATING EXPENSE | $466,480,385 | $478,133,581 | $630,807,091 | $396,707,373 | $392,253,687 |
| 3001  CLIENT SERVICES | $37,506,687,927 | $43,351,072,571 | $42,535,442,088 | $37,601,253,662 | $37,696,433,856 |
| 3002  FOOD FOR PERSONS - WARDS OF STATE | $17,470,834 | $20,918,074 | $21,450,451 | $21,450,451 | $21,450,451 |
| 4000  GRANTS | $1,686,478,170 | $2,116,621,946 | $1,999,805,048 | $1,903,587,830 | $1,904,839,201 |
| 5000  CAPITAL EXPENDITURES | $396,636,198 | $530,738,368 | $55,226,958 | $40,413,657 | $36,663,965 |
| OOE  Total (Excluding Riders) | $43,160,015,283 | $49,775,932,714 | $48,504,943,477 | $43,264,679,381 | $43,407,596,581 |
| OOE  Total (Riders) Grand Total | $43,160,015,283 | $49,775,932,714 | $48,504,943,477 | $43,264,679,381 | $43,407,596,581 |

(2 RR Ex. P-009 [PDF 194). HHSC also requested additional funds for an anticipated 9.9% increase in lease costs. (2 RR, Ex. P-009 [PDF 963, 964]).

In support of HHSC's funding requests for "RENT-BUILDING," HHSC stated that "HHSC has experienced a steady increase in lease costs from FY 2017

15

and costs increased significantly from $93.9 million in FY 2021 to an estimated $102.2 million in FY 2022." (2 RR, Ex. P-009 [PDF 963]).

In March 2023, while the 88th Legislature was in session and had not yet taken final action on HHSC's appropriation requests, Cross Park learned that the HHSC was in the process of moving out of the Leased Premises. (2 RR, Ex. P-008, Ex. 10 [PDF 2267-2268]). In response to Cross Park's inquiry, a TFC official told Cross Park that TFC was "unaware of the lease being terminated" as of March 27, 2023. (*Id.* [PDF 2267]).

The Legislature's session ended on May 29, 2023, with the passage of H.B. 1, the General Appropriations Act.[3] The next day, May 30, 2023, Mike Novak, TFC's Executive Director, sent written notice to Cross Park that "the [HHSC] has directed the [TFC] to terminate the above referenced Lease due to the non-availability of money, either appropriated by the legislature or funded by grants, to pay for the leased premises. . ." (2 RR, Ex. P-004). Novak stated that rent payments on the Lease would end on August 31, 2023. (*Id.*). Novak cited § 2167.055(e) of the Texas Gov't Code as authority for terminating the Lease. This statute provides that "a lease contract is contingent on the availability of money appropriated by the legislature to pay for the lease." (*Id.*).

However, before Novak sent the termination notice the Legislature had

---

[3] On June 18, 2023, Governor Greg Abbot signed HB 1. Governor Abbott did not veto any appropriates to HHSC.

16

appropriated $118,826,243 to HHSC for "Rent – Building" for fiscal year 2024 and

$119,751,160 to HHSC for "Rent-Building" for fiscal year 2025:

**Object-of-Expense Informational Listing:**

| | | |
|---|---:|---:|
| Salaries and Wages | $ 2,155,394,385 | $ 2,273,563,620 |
| Other Personnel Costs | 66,448,066 | 66,453,482 |
| Professional Fees and Services | 1,488,549,948 | 1,509,701,239 |
| Fuels and Lubricants | 1,400,052 | 1,400,052 |
| Consumable Supplies | 11,061,630 | 11,059,879 |
| Utilities | 44,593,400 | 44,593,400 |
| Travel | 28,476,794 | 27,878,512 |
| Rent - Building | 118,826,243 | 119,751,160 |
| Rent - Machine and Other | 24,579,765 | 24,579,765 |
| Other Operating Expense | 494,440,089 | 408,428,742 |
| Client Services | 40,082,411,166 | 39,293,451,973 |
| Food for Persons - Wards of State | 21,450,451 | 21,450,451 |
| Grants | 2,278,873,210 | 2,280,684,016 |
| Capital Expenditures | 108,980,199 | 37,763,847 |
| **Total, Object-of-Expense Informational Listing** | $ 46,925,485,398 | $ 46,120,760,138 |

(2 RR, Ex. P-010 [PDF 1824]).[4]

The Legislature appropriated $13.4 million *more* than HHSC asked to cover

lease costs for fiscal year 2024, and $14.5 million *more* than HHSC asked to cover

such costs for fiscal year 2025.[5]

On June 7, 2023, TFC asked that HHSC certify that funds to cover its lease

costs had been appropriated for the 2024-2025 biennium. (2 RR, Ex. P-008, Ex. 12

---

[4] Neither in this Court nor below have Appellants denied that the Legislature failed to appropriate funds to HHSC pay rent under the Cross Park Lease. Indeed, in the trial court Appellants admitted that the appropriated funds have been used for some other purpose. (CR 925) ("Given that the decision to terminate the lease took place over a year ago—*those funds have already been used for different purposes.*")(Emphasis added). Consequently, this Court should assume for purposes of deciding this appeal that the Legislature appropriated the funds necessary to pay the rent under the Cross Park Lease.

[5] HB 1 includes a provision explaining that $12,275,361 had been appropriated to HHSC for each upcoming fiscal year "for cost increases for state leases." (2 RR, Ex. P-010 [PDF 1881]). On June 22, 2023, HHSC's Chief Financial Officer, reported to HHSC's Executive Council on the agency's "very successful session from a funding perspective." (2 RR, Ex. P-012, Ex. A [PDF 1904]).

17

[PDF 2270]). TFC attached a spreadsheet identifying the leases for which certification was requested. *This list included the Cross Park Lease.* (2 RR, Ex. P-008, Ex. 12 [PDF 2270, 2273]).

On July 27, 2023, Appellant Rolland Niles ("Niles") responded by providing TFC with the requested "Certification of Funds" for the 2024-2025 biennium for the "active" leases on the TFC spreadsheet. (2 RR, Ex. P-008, Ex. 13 [PDF at 2276]). Although HHSC had been appropriated millions more than it requested to pay its lease costs for fiscal years 2024 and 2025, Niles certified that for the 2024-2025 biennium, only $93,767,377.36 was available for the "active" state leases. (*Id.*). This was $25 million less than the Legislature had appropriated to HHSC to cover lease costs. Niles stated that five state leases, including the Cross Park Lease "would no longer be active." (*Id.*).

Niles did *not* say that appropriated funds were unavailable to pay for the five "inactive" leases during the 2024-2025 biennium. The combined total annual payments on those five leases for fiscal year 2024 was approximately $7.2 million, well within the $25 million still available to HHSC for its lease costs. Niles's letter also did not state that HHSC had determined that the five "inactive" leases were providing HHSC with "idle facilities" or "idle capacity." 1 T.A.C. § 115.21(a).

18

## III. The proceedings below.

On September 25, 2023, Cross Park sued Appellants (and other officials) for declaratory judgment, breach of contract, and *ultra vires* conduct. (CR 4, 638, 647, 648). Cross Park sought injunctive and such other relief to which it was entitled. (CR 650-651). Appellants filed pleas to the jurisdiction on the ground of sovereign immunity from suit. (CR 893). On January 17, 2024, following an evidentiary hearing, the trial court denied Appellants' pleas. (CR 1121-1122).[6]

## SUMMARY OF THE ARGUMENT

The trial court correctly denied the pleas to the jurisdiction of the State and its agencies, TFC and HHSC. Chapter 114 of the Tex. Civ. Prac. & Remedies Code waives immunity from suit on the Cross Park Lease. The Lease is a "contract subject to" Chapter 114 because TFC executed it on behalf of the State for HHSC's benefit, and because the Lease and its amendments include the provision of construction services to HHSC.

The trial court correctly denied the pleas to the jurisdiction of Novak and Niles because they engaged in *ultra vires* conduct. They attempted to terminate the Cross Park Lease due to lack of funding, which is shown to be inaccurate. Cross Park alleged and introduced evidence showing that the Legislature provided sufficient funds to cover the costs of the Lease for the 2024-2025 biennium. Furthermore, in

---

[6] The trial court granted the plea to the jurisdiction filed by Cecile Erwin Young, Executive Director of HHSC and Glenn Hegar, Texas Comptroller of Public Accounts. (CR 1121).

trying to cancel the Lease, Novak and Niles violated TFC regulations governing the cancellation of a state lease due to lack of funding as well as the Lease's termination provision. None of the mandatory prerequisites for cancelling or terminating the Lease were satisfied. Because of Novak's and Niles's unlawful conduct, the Lease remains in effect, with the State legally bound to honor its obligations to Cross Park under the Lease.

Sovereign immunity does not bar Cross Park from seeking declaratory, injunctive, and mandamus relief from the trial court confirming that the Legislature appropriated funding for the Cross Park Lease and compelling Novak and Niles to retract their unlawful attempt to terminate the Lease, to treat the Lease as still effective and binding on the State, to authorize payments of the rent obligations due under the Lease by the Comptroller, and, if Appellants should again attempt to terminate the Lease before its August 31, 2028 expiration date, to comply with the termination procedures mandated by TFC's regulations and the Lease.

## BRIEF OF ARGUMENT[7]

## ARGUMENT AND AUTHORITIES UNDER ALL ISSUES

### I. Standard of review.

This Court reviews *de novo* the trial court's decision to deny Appellants' pleas

---

[7] Pursuant to Tex.R.Evid. 201, Cross Park asks this Court to take judicial notice of the Brief of Appellee Broadmoor Austin Associates filed in No. 15-25-00013. Cross Park adopts and incorporates by reference the arguments in Broadmoor's Brief of Appellee to the extent those arguments are not inconsistent with the arguments set forth in this brief.

to the jurisdiction. *Fraley v. Tex. A&M Univ. Sys.*, 664 S.W.3d 91, 97 (Tex.2023). When government defendants challenge a trial court's subject-matter jurisdiction based on sovereign immunity, the plaintiff must affirmatively demonstrate the trial court's jurisdiction, which encompasses establishing a waiver of sovereign immunity in suits against the State. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex.2019). The plaintiff must plead facts sufficient to show that the trial court has subject-matter jurisdiction over the causes of action asserted. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993). The trial court must construe the plaintiff's pleadings liberally in the plaintiff's favor and accept the factual allegations in the plaintiff's pleadings as true. *Tex. Dep't of Criminal Justice v. Rangel*, 595 S.W.3d 198, 205 (Tex.2020). Furthermore, in deciding a plea to the jurisdiction, the trial court "is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex.2000).

If the evidence and allegations create a fact question regarding jurisdiction, then the trial court must deny the plea to the jurisdiction, and the factfinder must resolve the jurisdictional fact issue. *Rangel*, 595 S.W.3d at 205; *Pepper Lawson Horizon Int'l Group, LLC v. Tex. S. Univ.*, 669 S.W.3d 205, 211 (Tex.2023) ("[A] plea to the jurisdiction does not authorize an inquiry so far into the substance of the claims that plaintiffs would be required to put on their case to establish

21

jurisdiction.").

## II. Cross Park pleaded and produced evidence showing a valid waiver of immunity from suit.

Appellants contend that Cross Park failed to plead a valid waiver of immunity from suit under Chapter 114 of the Tex. Civ. Prac. & Rem. Code ("Chapter 114"). (App.Br. at 22). In support of this contention, Appellants make various arguments, none of which has merit.

### A. *Chapter 114 waives Appellants' immunity from Cross Park's suit.*

Appellants argue that Chapter 114 waives immunity from suit only for state agencies—not for the State. Appellants are wrong. State agencies are arms of the State. The State performs its governmental functions by and through state agencies. *See e.g.,* Tex. Gov't Code § 2167.055(a). For these reasons, a suit against a state agency is a suit against the State. *Lowe v. Texas Tech Univ.,* 540 S.W.2d 297, 298 (Tex.1976).

Chapter 114 recognizes that the State acts through its agencies when contracting for goods and services that include the provision of engineering, architectural, or construction services to a state agency, and that such contracts are executed on behalf of the recipient state agency by the state agency authorized to contract for such services. Tex. Civ. Prac. & Rem. Code § 114.001(2).

The Legislature has made TFC the state agency responsible for determining

22

whether state agencies have a need for space to perform their functions. Tex. Gov't. Code § 2165.105(b).[8] The Legislature authorizes the TFC to enter into contracts that concern leases for needed space as well as construction, maintenance, and repair services. Tex. Gov't Code §§ 2151.003(1)(B)-(D), 2151.004(c), 2167.002(a).

The Cross Park Lease was signed on behalf of the State "[a]cting by and through" the TFC's predecessor, the General Services Commission to acquire space for the "occupying state agency"—HHSC. (2 RR, P-008, Ex. 1 [PDF 2232). The Lease provided that monthly statements for rent would be submitted to "the occupying state agency," (*Id.*). HHSC approved the Lease, and the Legislature has appropriated money to HHSC to pay its lease cost obligations. On the execution of the Lease, the TFC's "obligation" "to accept the space" became "binding." Tex. Gov't Code § 2167.055(f).

The Legislature is presumed to have enacted a statute "with complete knowledge of the existing law and with reference to it." *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex.1990). When enacting Chapter 114, the Legislature understood that any suit against a state agency based on a contract for

---

[8] In its appropriations request, HHSC recognized the TFC's authority:

> "Lease contracts are entered into by Texas Facility Commission (TFC) with lessors on behalf of occupying agencies . . . TFC enters into lease contracts in good faith on behalf of state agencies. Their input is required before lease payments are withheld or an agency seeks to end a lease prematurely for any reason." (2 RR, Ex. P-009 [PDF 964]).

23

goods or services involving engineering, architectural, or construction services or materials would be a suit against the State, and that any recovery by the plaintiff on such a contract would come from state funds. *Herring v. Houston Nat. Exch. Bank,* 269 S.W. 1031, 1033 (Tex.1925) ("The board of prison commissioners . . . is purely an agency of government . . . If it can be sued without legislative consent . . . then the government, the sovereignty, can be so sued. *There is no difference.*"). [9]

Because the State must act through its agencies when contracting for engineering, architectural, or constructions services, the State is "a state agency" for purposes of Chapter 114, which waives the State's immunity from suit on such contracts. Tex. Civ. Prac. & Rem. Code §§ 114.001(2), 114.002, 114.003.

Appellants argue that Chapter 114 does not waive HHSC's or TFC's immunity from suit because neither agency is a party to the Lease with Cross Park and has no contractual relationship with Cross Park. (App.Br. at 24, 27). This argument is erroneous for several reasons.

First, HHSC and TFC have no immunity from suit separate from the State's immunity. Their immunity exists because they are arms of the State and share in the State's immunity. *Sampson v. University of Texas at Austin,* 500 S.W.3d 380, 384

---

[9] The legislative history of Chapter 114 shows that the Legislature had the same understanding. *See* statements of the House sponsor of H.B. 586, Rep. Workman, during the House Judiciary & Civil Justice Committee hearing of April 8, 2013, at 3:18-3:19, 4:15-4:19 (https://house.texas.gov/videos/5016). *See also* statements of the Senate sponsor of H.B. 586, Sen. Deuell, during the Senate State Affairs Committee hearing of May 16, 2013 (Part II), at 42:37-43.38 (https://senate.texas.gov/videoplayer.php?vid=16875&lang=en).

(Tex.2016); *Members of the Board of Regents v. Hilley*, No. 05-93-01729-CV, 1994 WL 708295, at *10 (Tex.App.—Dallas Dec. 21, 1994, writ denied) (not designated for publication). Chapter 114 waives the State's immunity from suit Chapter 114 for "contracts subject to this chapter . . ." This waiver extends to the state agencies executing, benefitting from, and performing such contracts.

Second, neither TFC nor HHSC is a stranger to the Cross Park Lease. TFC's predecessor signed the Lease acting by and through the State. TFC made and approved all amendments to the Lease and was obligated to accept the leased space. HHSC is the "occupying state agency" tenant. Funds appropriated by the Legislature to HHSC have been used to pay rent due under the Lease. In short, the State, acting through TFC, acquired the leased space for HHSC, which used appropriated funds to pay the rent due under the Lease. Under certain conditions, the TFC could terminate or adjust the Lease.

Third, TFC and HHSC act through their officials. Cross Park seeks relief by mandamus against Novak and Niles for refusing to perform ministerial duties concerning the Lease. Because both the Texas Constitution and the Legislature authorize the issuance of writs of mandamus against public officials, sovereign immunity does not bar a suit seeking such relief. [10]

---

[10] *Womack v. Berry*, 291 S.W.2d 677, 682 (Tex.1956); *Crouch v. Stanley*, 390 S.W.2d 795, 798 (Tex.Civ.App.—Eastland 1965, writ ref'd n.r.e.); *see also Jernigan v. Finley*, 38 S.W. 24, 25 (Tex.1896) (sovereign or governmental immunity does not bar a mandamus action to compel the performance of duties imposed by law, such a suit "is proper and maintainable, because the state

25

## B.    Cross Park's contract is within the scope of Chapter 114.

Appellants contend that Cross Park's breach-of-contract claim is outside the scope of Chapter 114's waiver of immunity because "a lease for square footage in an office building is not a contract 'for providing goods and services' within the meaning of Chapter 114." (App.Br. at 28). Appellants are wrong.

Chapter 114's waiver of immunity from suit covers the breach of an express provision of "a contract subject to this chapter. . ." Tex. Civ. Prac. & Rem. Code § 114.003. Chapter 114 defines a "contract subject to this chapter" as a "written contract stating the essential terms of the agreement for providing goods or services to the state agency that is properly executed on behalf of the state agency." Tex. Civ. Prac. & Rem. Code § 114.001(2). The contract for providing goods and services must include engineering, architectural, or construction services (or materials relating to such services). Tex. Civil Prac. & Rem. Code § 114.002.

The language of Chapter 114 shows that it is unnecessary for the contract to be concerned solely with the provision of engineering, architectural, or construction services or materials to a state agency. All that is required for the contract to fall within Chapter 114's waiver is for it to include the provision of such services or materials to a state agency. The Cross Park Lease meets this requirement. *Coinmach*

---

has authorized it to be brought."); *Thompson v. Baker*, 38 S.W. 21, 23 (Tex.1896) ("If the state furnishes a remedy by process against itself or its officers, that process may be pursued, because it has consented to submit itself to that extent to the jurisdiction of the courts . . . .").

*Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 925 (Tex.2013) ("[A] contractual relationship can include both the granting of a property interest and an agreement to provide goods or services.").

The Cross Park Lease is "a contract subject to" Chapter 114 because the Lease together with the 2016, 2018, and 2020 amendments to it provide construction services to HHSC. (2 RR, Ex. P-008, Ex. 1 [PDF 2232]; Ex. 5 [PDF 2249]; Ex. 6 [PDF 2252]; Ex. 7 [PDF 2256]; Ex. 8 [PDF 2260]; Ex. 9 [PDF 2264]).

Appellants argue that the services the landlord agreed to provide to the tenant under the Lease were only for janitorial and general maintenance services. (App.Br. at 32). That is incorrect. The Lease and the 2016, 2018, and 2020 amendments to it show that the landlord was required to provide HHSC with construction services necessary to build out and alter the additional space added by the amendments and to prepare the leased space for HHSC's occupancy and use. (2 RR, Ex. P-008, Ex. 5 [PDF 2249]; Ex. 6 [PDF 2252]; Ex. 7 [PDF 2256]; Ex. 8 [PDF 2260]; Ex. 9 [PDF 2264]).

Appellants also argue that Cross Park cannot show that it failed to receive "the benefit of the bargain" for construction services rendered under the Lease before the Lease was declared "inactive." (App.Br. at 32). Appellants ignore the fact that the rent due under the Lease is the method by which Cross Park recoups the considerable expense it incurred in performing construction services for HHSC. Appellants'

27

invalid attempt to terminate the Lease is preventing Cross Park from recouping those construction expenses.

Appellants' reliance on *Lubbock County. Water Control & Imp. Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 302 (Tex.2014) is misplaced. There, the supreme court ruled that immunity from suit existed because the lease contract had no provision for the payment of the "marina-operated services" that the landlord provided. Appellants suggests that *Lubbock County* requires a "direct payment" for the services to be provided by the landlord in order for a waiver of immunity to exist. (App.Br. at 29). But the supreme court rejected this exact argument in *Campbellton Rd., Ltd. v. City of San Antonio by & through San Antonio Water Sys.*, 688 S.W.3d 105, 123 (Tex.2024).

In *Campbellton*, the supreme court makes it clear that no such direct connection between the services provided and the "amounts due in the contract" is required:

> "We next consider SAWS's argument regarding the absence of a payment provision. In *Lubbock County*, we found further support for our conclusion that the parties did not mutually assent to the provision of services because the lease contained no terms in which the district agreed to pay 'any amount' for the lessee to provide marina-operation services. We also noted that the Act limited recoverable damages to "'the balance due and owed by the local governmental entity under the contract,' plus attorney's fees and interest."' Construing the Act's immunity waiver in light of this damages limitation, we recognized that the 'waiver will typically apply only to contracts in which the governmental entity agrees to pay' for the services.

" . . . [S]ince *Lubbock County*, we have (1) recognized that the Act's damages limitation did not preclude specific performance as a remedy and (2) broadly interpreted the statutory phrase 'the balance due and owed' to mean 'the amount of damages for breach of contract payable and unpaid,' even if the amount is not 'stated in,' 'expressly provided for in,' or even 'ascertainable from' the contract. *Lubbock County and its progeny instruct that the absence of an express money-payment provision, standing alone, must not be given too much weight in determining whether contracting parties agreed to service terms, so long as the service terms are 'sufficiently definite to "enable a court to understand the parties' obligations,' and to give 'an appropriate remedy' if they are breached.'"* (Emphasis added). 688 S.W.3d at 120-121.

Unlike the situation in *Lubbock County*, the parties to the Cross Park Lease agreed to a method of exchange and manifested mutual assent to those terms. *Id.* at 120-122. The Cross Park Lease requires the landlord to perform multiple services including the construction services set out in the Add Space Amendments in exchange for payment of rent and other amounts due under the Lease. The landlord recoups the costs of providing the construction services through the rent payments.

Appellants argue that the construction services provided concern only off-street parking and building maintenance. (App.Br at 28). Not so. The Lease has required the landlord to provide construction and renovation services throughout its existence. (2 RR, Ex. P-008, Ex. 1 [PDF 2232]; Ex. 5 [PDF 2249]; Ex. 6 [PDF 2252]; Ex. 7 [PDF 2256]; Ex. 8 [PDF 2260]; Ex. 9 [PDF 2264]).

The case of *Hoppenstein Props., Inc. v. McLennan Cnty. Appraisal Dist.*, 341 S.W.3d 16, 20 (Tex.App.—Waco 2010, pet. denied) is instructive and consist with

29

the *Campbellton* decision. The lease in *Hoppenstein* required the landlord to provide construction renovations for the county appraisal district's offices. The court of appeals rejected the appraisal district claim of immunity, holding that immunity was waived under Chapter 271 of the Tex. Loc. Gov't Code because the lease required the landlord to renovate the leased premises.[11]

The court of appeals in *Hoppenstein* ruled it irrelevant that the only provision of the lease alleged to be breached was the covenant to pay rent. 341 S.W.3d at 20. The key factor was that the lease required the landlord to provide construction services to the appraisal district, which fell within the scope of the waiver provided in Chapter 271. In other words, the provision of construction services need not be the primary purpose of the agreement. *Id.*

Thus, even if a typical lease is not considered to be an agreement for the provision of services, because the appraisal district's lease required the landlord to provide construction services, immunity from suit was waived under Chapter 271 for all claims arising under the lease. 341 S.W.3d at 20-21.

The *Hoppenstein* analysis applies to this case. Multiple provisions of the Cross Park Lease, as amended, have required the landlord to provide construction services to HHSC throughout the life of the Lease. Because the Lease and its amendments obligate the landlord to provide such services, immunity is waived

---

[11] Chapter 271 was enacted in 2005 and waives immunity from suit on contracts for the provision of goods or services to local governmental entities.

under Chapter 114 for all claims arising under the Lease.

Appellants ask the Court to ignore *Hoppenstein* and *Campellton* because those decisions concerned Chapter 271. (App.Br. at 30-31). But Appellants ignore the fact that Chapter 114 was modeled on Chapter 271. The provisions of Chapter 114 and Chapter 271 most relevant to this case are practically identical.[12] Cases interpreting Chapter 271 are therefore persuasive in applying the provisions of Chapter 114. *Pepper Lawson*, 669 S.W.3d at 210-211 (noting that Chapter 271 and Chapter 114 are "similarly-worded"); *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 931 n.3 (Tex.2010) (when the legislature has used a phrase in a statute, and subsequently uses the same phrase in legislating on the same subject-matter, it will be understood that the phrases should have the same meanings).

Because the Cross Park Lease requires the landlord to provide construction services to HHSC, the immunity-waiver analysis under Chapter 114 ends— immunity has been waived for *all claims* arising under the Lease—because the statutory waiver analysis is made on a "contract by contact" basis, and not a "promise by promise" basis. *Campbellton*, 688 S.W.3d at 123 ("No doubt, the services to SAWS were not the central purpose of the Contract...[b]ut we have repeatedly emphasized that the agreement to provide services need not be the 'primary purpose' provided the benefits to the governmental entity are "sufficiently direct and

---

[12] *See* Appendix,, which is a side- by-side comparison of key provisions of Chapters 271 and 114.

31

concrete.").

Appellants assert that Cross Park has not identified any "express" or "specific" provisions of the Lease that was breached other than the rent obligation. (App.Br. at 29, 32). That is incorrect. Cross Park's petition alleges that Appellants breached the termination provision of the Lease as well as the obligation to pay the rent due under the Lease. (CR 648). Both the termination provision and the rent obligation are "express" provisions of the Lease.

## III. Sovereign Immunity does not bar Cross Park's UDJA claims.

Cross Park seeks a judicial declaration that the 88th Legislature in H.B. 1 appropriated funds to HHSC to pay the rent on the Cross Park Lease for the biennium beginning September 1, 2023.

Appellants argue that Cross Park's requested declaration would not resolve the underlying controversy. (App.Br. at 34, 36). On the contrary, the requested declaration is germane to, and an integral part of, Cross Park's contract claims against the State and its agencies, and to its *ultra vires* claims against Novak and Niles. A judicial declaration that the Legislature appropriated sufficient funds to cover the costs of the Lease for the 2024-2025 biennium will show that the attempted termination of the Cross Park Lease due to lack of funding was invalid; that Novak and Niles violated ministerial duties in their wrongful effort to terminate the Lease due to lack of funding; and that the Lease remains effective and binding on the State.

32

The evidence introduced at the hearing on Appellants' pleas to the jurisdiction shows that the Legislature appropriated more than enough funds to HHSC to cover HHSC's lease costs for fiscal years 2024 and 2025.[13] If the trial court declares that sufficient funds exist to cover the costs of the Cross Park Lease for the 2024-2025 biennium, then that declaration, together with Niles's and Novak's violation of the required procedures for terminating the Lease due to lack of funding, will show that Niles and Novak had no discretion to terminate the Lease based on non-availability of funds.

Appellants argue that the requested judicial declaration is part of Cross Park's breach of contract claim which is barred by immunity and that a declaratory judgment claim cannot be brought against Novak and Niles. (App.Br. at 36). Appellants are wrong.

As shown above, the requested declaration affects the claims for which immunity has been waived as well as the claims against Novak and Niles for *ultra vires* conduct. A declaration that the Legislature appropriated sufficient funds to pay the Cross Park Lease for the 2024-2025 biennium will show that Novak's and Niles' attempt to terminate the Lease due to lack of funding was unlawful, thereby leaving the Lease in effect and binding on the State. Such relief is proper. *See e.g., Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivisions Prop./Cas.*

---

[13] At the very least, Cross Park's evidence raises a fact issue that supports the trial court's denial of the pleas.

*Joint Self-Ins. Fund*, 212 S.W.3d 320, 323, 328 (Tex.2006) (immunity from suit waived under Chapter 271 in suit seeking a declaratory judgment on whether a loss was covered under an insurance policy);*City of Cleburne v. RT Gen., LLC*, No. 10-20-00037-CV, 2020 WL 7394519, at *6 (Tex. App.—Waco Dec. 16, 2020, no pet.) (mem. op.) (governmental entity's immunity waived for declaratory relief sought to determine the rights of the parties to a contract subject to Chapter 271; *State v. 1165 Airport Boulevard Office Building, Ltd.*, 212 S.W.3d 610, 618 (Tex.App.—Austin 2006, no pet.) (declaratory relief proper where plaintiff sought a declaration that a commission's statutorily-required report to comptroller was void). *See also, Cobb v. Harrington,* 190 S.W.2d 709, 712 (Tex. 1945) (legislative consent not required for declaratory judgment suit against state comptroller to determine parties' rights under tax statute); *City of Round Rock v. Whiteaker,* 241 S.W.3d 609, 628 (Tex.App.—Austin 2007, pet. denied) (suit over whether a government official engaged in illegal or authorized actions in which declaratory relief was sought concerning the official's authority is not barred by sovereign immunity).

## IV.  Cross Park's *ultra vires* claims against Novak and Niles are not barred by sovereign immunity.

The sovereign immunity doctrine applies to lawsuits against state officials acting in their official capacities. However, the doctrine does not apply to suits seeking to compel state officials to comply with the law and to perform ministerial duties. *Hartzell v. S.O.,* 672 S.W.3d 304, 311 (Tex.2023). Nor does the doctrine bar

the issuance of a writ of mandamus to correct a public official's clear abuse of discretion. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 793 (Tex.1991).

To maintain an *ultra vires* suit, the claimant must allege that the official-capacity defendant "acted without legal authority or failed to perform a purely ministerial act." *Hartzell*, 672 S.W.3d at 311. Cross Park has met this standard by expressly and unequivocally pleading and producing evidence that Novak and Niles acted without legal authority and failed to perform mandatory/non-discretionary acts in their unlawful attempt to terminate the Cross Park Lease. (CR 648-650).

### A. Novak and Niles acted without and contrary to legal authority and failed to perform ministerial acts.

1. The termination procedures of the Lease and applicable law.

The Lease, as amended, provides that it expires on August 31, 2028, "unless extended or terminated earlier in accordance with the terms of the Lease." (2 RR, Ex. P-008, Ex. 8 [PDF 2260]). Portions of the Lease cannot be canceled before November 30, 2025. (2 RR, Ex. P-008, Ex. 9 [PDF 2265]).

However, the Lease is subject to provisions of Title 10, Subtitle D of the Texas Government Code and contingent upon "the availability of state funds appropriated by the Legislature, to cover the full term and cost of this lease." (2 RR Ex. P-008, Ex. 1 [PDF 2232]). The Lease's termination provision is consistent with Chapter 2167 of the Texas Gov't Code, which makes the lessee's obligations "contingent upon the continuation of the availability of money appropriated by the legislature to

35

pay for the lease" and allows the TFC to terminate the lease *only if* (1) the Legislature ceases to "fund the lease" or the occupying agency ceases to exist. Tex. Gov't Code. § 2167.055(e). If either event occurs, the Lease's termination provision requires the TFC to try to find another state agency or agencies to fill or partially fill the Leased Premises before issuing a notice of termination. (2 RR, Ex. P-008, Ex. 1 [PDF 2232]).

The TFC has adopted procedures for canceling a state lease due to lack of funding. TFC regulation 1 T.A.C. § 115.21(a) provides that "[p]rior to requesting that the [TFC] cancel a lease due to lack of funding, *the governmental agency shall determine that it occupies idle facilities or has idle capacity* due to one or more of" five listed factors.[14] (Emphasis added). Subsection (b) of § 115.21 provides that

> "Upon furnishing *a written determination* that the governmental agency occupies idle facilities or has idle capacity based on the factors set out in subsection (a) above to the [TFC], *a lease may be considered for cancellation* by the [TFC] upon request by a governmental agency." (Emphasis added).

TFC regulation 1 T.A.C. §§ 115.22 (b) and (c) require that:

> "(b) A request by [HHSC] to cancel a lease due to lack of funding *must*

---

[14] Those five factors are:

(1) changes in program requirements;

(2) the implementation of changes that result in a reduction in staff;

(3) consolidation of office or building space to achieve cost efficiencies;

(4) a change in client demographics resulting in the need to relocate staff to other locations; or

(5) efforts to achieve more economical operations, reorganization, termination, or other causes which could not have been reasonably foreseen.

36

*have the approval of the governing body of the [HHSC] making the request . . . [and an]* agency under the authority of an individual commissioner or executive director, appointed by or directly accountable to the Governor, *must provide evidence of notification to the Office of the Governor in order for such a request to be considered for action by the Commission*; and

(c) Unless the term of the lease is amended by written agreement between a lessor and the [TFC], *the [TFC] will serve written notice to the lessor of intent to cancel the lease effective on a date certain at least 180 days prior to the date of the lease cancellation . . .*(Emphasis added). [15]

An agency is bound by its own regulations. *Rodriguez v. Service Lloyds Ins.*, 997 S.W.2d 248, 255 (Tex.1999). "When a state agency adopts an administrative rule, it commits itself to follow the plain meaning of the promulgated text." *Port Arthur Community Action Network v. Tex. Comm'n on Env't Quality*, 707 S.W.3d 102, 104 (Tex.2025). HHSC and TFC, acting through Novak and Niles had to comply with these regulations in order for the Cross Park Lease to be lawfully canceled or terminated before August 31, 2028.

2. Novak's conduct was *ultra vires.*

Under the terms of the Cross Park Lease, Chapter 2167, and the TFC regulations, the TFC's executive director, Mike Novak, was authorized to send notice

---

[15] Appellants argued below that this regulation, which was adopted in 2016, did not apply to the Cross Park Lease because it was originally entered into before 2016. (CR 917). However, the TFC's rule-making record shows that the regulation applies to "any request to cancel a lease" that occurs *after* the effective date of the regulation. *See* 41 Tex. Reg. 7709-7011 (2016) explaining applicability of the new regulations to existing leases with "funding out" clauses and describing the regulations as applicable to "any request to cancel a lease due to lack of funding."). Appellants have not raised that argument in this Court.

of termination of the Cross Park Lease only if (1) the Legislature failed to "fund the lease" for the 2024-2025 biennium beginning September 1, 2023; (2) HHSC certified that fact to TFC; (3) HHSC provided TFC with a written determination that HHSC occupied "idle facilities" or had "idle capacity;" (4) the TFC could not find another state agency to fill, or partially fill, the Lease Premises; (5) HHSC's governing body approved a request to cancel the Lease due to lack of funds; (6) HHSC—which is under the authority of an individual executive commissioner appointed by the Governor—provided evidence that the Governor's Office was notified of the request to cancel; and (7) TFC] gave written notice to Cross Park of the intent to cancel the Cross Park Lease at least 180 days prior to the date of the lease cancellation.

None of these events happened. Consequently, Novak's notice of termination was unlawful, and the attempted termination of the Lease was invalid. Appellants argue that because HHSC determined that funds for the Lease were unavailable, Novak "simply carried out the actions within his authority to complete the action—terminating the Lease—after HHSC made the determination." (App.Br. at 40). Appellants' argument is wrong, both factually and legally.

Cross Park has alleged and provided evidence showing that the Legislature appropriated the funds HHSC needed to cover the costs of the Cross Park Lease for the 2024-2025 biennium. (2 RR, Ex. P-010 [PDF 1824]). Appellants have never

38

denied this fact. Nor could they. The Legislature gave HHSC millions more for rent than the HHSC requested—$13.4 million more for fiscal year 2024, and $14.5 million more for fiscal year 2025.

Novak issued the termination notice to Cross Park on May 30, 2023. Novak attached no order or resolution of HHSC's governing board approving a request to cancel the Cross Park Lease due to lack of funding; no evidence of notification by HHSC to the Governor's Office of any request to cancel the Lease; no "written determination" that HHSC was occupying idle facilities or had idle capacity—all of which was required by TFC regulations before a lease could be canceled for lack of funding. Novak's termination notice also failed to state that TFC had been unable to fill the Lease Premises, in whole or in part, with other state agencies, as required by the termination provision of the Lease.

Even more disturbing, Novak sent the termination notice *before* TFC had even asked HHSC to certify whether funds had been appropriated to pay existing leases for the next biennium pursuant to § 2167.101 of the Tex. Gov't Code.[16] TFC did not make its certification request to the HHSC until June 7, 2023. TFC included the Cross Park Lease in the attached spreadsheet of leases sent to HHSC for certification—even though a termination notice had already been sent to Cross Park.

---

[16] Section 2167.101 of the Tex. Gov't Code provides that "[a] state agency [HHSC] *occupying space leased* under this chapter shall certify to the [TFC], at least 60 days before the beginning of each fiscal biennium during the lease term, that money is available to pay for *the lease* until the end of the next fiscal biennium." (Emphasis added).

39

(2 RR, Ex. P-008, Ex. 12 [PDF 2270, 2273]).

In his response of July 27, 2023 to TFC's certification request, Niles made no statement that HHSC's governing body had determined that funds were unavailable to pay the costs of the Cross Park Lease, or that the governing body had approved a request to cancel the Cross Park Lease due to lack of funding. Niles's response also did not certify whether or not funding was available to cover the costs of the Cross Park Lease even though the TRC's certification request asked HHSC to certify whether "funds will be available *for each State Lease, as attached*." (Emphasis added). (2 RR, Ex. 12 [PDF 2270]).

Instead, Niles's response simply stated that HHSC was treating the Lease as "no longer . . . active after August 31, 2023." (2 RR, Ex. P-008, Ex. 13 [PDF at 2276]). The reason for treating the Lease as "inactive" was not specified. Niles's response did not include a written determination that the Cross Park Lease was providing HHSC with "idle facilities" or "idle capacity."

The evidence thus shows that Novak sent the termination notice (i) in the absence of a written request approved by HHSC's governing body to cancel the Cross Park Lease due to lack of funding; (ii) in the absence of evidence of notification to the Governor's Office of a request to cancel the Lease; (iii) in the absence of a written determination by HHSC that the Lease was providing HHSC with idle facilities or capacity; (iv) in the absence of a certification that funding for

40

the Lease was unavailable; (v) in the absence any effort by TFC to find another state agency to fill, or partially fill, the Lease Premises; and (vi) with only 90-days' notice of lease cancellation instead of the 180-days' notice mandated by 1 T.A.C. §§ 115.22(c).

Because Novak failed to follow the procedures for terminating the Cross Park Lease required by the Lease and by the applicable law, his conduct was *ultra vires*. Nevertheless, Appellants say that Novak acted within his discretion when he sent the termination notice. (App.Br. at 41, 42). A discretionary function, however, is one involving choice or judgment. *United States v. Gaubert,* 499 U.S. 315, 322 (1991). Neither the Lease nor applicable law gave Novak the choice or judgment to violate the procedures mandated for terminating the Lease due to lack of funding.

Appellants suggest that § 2167.0021 of the Tex. Gov't Code gave TFC, and hence Novak, the discretion to terminate the Cross Park Lease even though the Legislature had appropriated the funds to cover the rentals due under it. (App.Br. at 40). Section 2167.0021 provides no such authority or discretion. The statute concerns guidelines for TFC to follow to order to obtain the "best value" for the State when deciding whether to enter into a lease contract. It says nothing about terminating an existing lease.

### 3. Niles's conduct was *ultra vires.*

Cross Park has alleged and provided evidence showing that Niles acted

41

without legal authority by wrongly treating the Cross Park Lease (and four others) as "no longer . . . inactive" and by refusing to certify that the funds appropriated to HHSC for rent during the 2024-2025 biennium were sufficient to cover the costs of the Lease.

Like Novak, Niles was bound by the procedures for terminating the Lease set out in the Cross Park Lease and in the applicable statutes and regulations. On July 27, 2023, less than 60 days before the start of 2024-2025 biennium on September 1, 2023, Niles informed TFC that the Cross Park Lease and four others would be "no longer be active after August 31, 2023." (2 RR, P-008, Ex. 13 [PDF 2276]). Niles did *not* state that the Legislature had failed to appropriate sufficient funds to cover the costs of the five leases for the next biennium. Nor did Niles state that or certify that HHSC had determined that funds were unavailable to fund those leases; that HHSC had determined that those leases were providing it with idle facilities or idle capacity; or that HHSC's governing board had approved a request to cancel those leases due to lack of funding. Niles simply declared that the leases would "no longer be active after August 31, 2023" and refused to perform the ministerial duty of certifying that funds were available to pay the Lease obligations. (*Id.*).

No provision of the Lease or of the applicable statutes and regulations gave HHSC or Niles the authority or discretion to deem the Cross Park Lease "inactive," to refuse to use the funds appropriated by the Legislature to pay the rent due under

42

the Cross Park Lease and the other existing leases occupied by HHSC, and to ignore and violate TFC regulations. The only lawful way to terminate the Lease was to follow the procedures for termination mandated by the lease agreement and applicable law. Niles had a ministerial duty to comply with those procedures. By not doing so, Niles acted *ultra vires*, which rendered invalid the attempted termination of the Lease.

Niles's unlawful actions show that the Cross Park Lease was *not* being terminated due to lack of funding. HHSC had begun vacating the leased premises as early as February 2023—*before* the Legislature acted on HHSC's budget request. (CR 6; 2 RR, Ex. P-003). Novak's notice of termination, issued May 30, 2023, shows that the funds appropriated in the previous biennium (2021-2023) were sufficient to pay the rent on the Lease through August 31, 2023. (2 RR, Ex. P-008, Ex. 11 [PDF 2269]). Novak issued the termination notice in the absence of a request approved by HHSC's governing body to cancel the Lease due to lack of funding, in the absence of a written determination that the Lease was providing HHSC with idle facilities or capacity, and before TFC asked HHSC to certify whether funds would be available to pay the costs of the Lease for the 2024-2025 biennium. Novak thus had no legal basis on which to issue the termination notice.

Novak also issued the termination notice *before* Governor Abbot signed HB 1 which appropriated $118,826,243 to HHSC for "Rent – Building" for the 2024

43

fiscal year and $119,751,160 for the 2025 fiscal year—more than enough to cover all HHSC existing lease obligations, including those of the Cross Park Lease. HHSC used those existing leases, including the Cross Park Lease, as justification for obtaining this appropriation, but then sought to avoid its obligations the Cross Park Lease and four others, claiming unavailability of funds. This regrettable conduct of HHSC and its officials reeks of bad faith.

### B. Niles had no discretion to refuse to comply with the mandated termination procedures or to divert money appropriated for rent to "different purposes."

Appellants argue that Cross Park's *ultra vires* claim against Niles cannot be maintained because "HHSC officials," which includes Niles, had "the discretion to determine how to spend the general 'lease' funds appropriated by the Legislature." (App.Br. at 42, 43). Appellants stated below that the funds appropriated for the Lease *"have already been allocated for different purposes."* (Emphasis added). (CR925). In this Court, Appellants argue—without any supporting authority—that HHSC has the discretion to determine the best use of funds appropriated to it by the Legislature and to allocate those funds as HHSC sees fit in order "to balance its budget" and "to pay various expenses." (App.Br. at 42, 43, 46).

HHSC and its officials are claiming the absolute power to refuse to spend the money the Legislature appropriated to HHSC to pay existing lease obligations and to divert that money to other purposes and to pay other expenses. In other words,

44

Appellants are arguing that HHSC is free to use only $93 million of the $118 million appropriated to it to pay rent on existing leases, ignore its rent obligations on other existing leases, and use the remaining $25 million to cover expenses in the pursuit of other purposes. This claimed "discretion" is contrary to law and founded on a misunderstanding of Texas *ultra vires* jurisprudence.

If the funds the Legislature appropriated to HHSC for rent have, as the evidence and Appellants' trial court statements strongly suggest, "already been allocated for different purposes," then Appellants have acted unlawfully. "[T]he State is bound by its contract as a private citizen is bound by a like contract." *State v. City Nat'l Bank,* 578 S.W.2d 155, 159 (Tex.Civ.App.—Tyler 1979), aff'd, 603 S.W.2d 764 (Tex.1980). HHSC, TFC, and its officials have no legal power or authority to reject or annul a valid contract once it has become legally binding on the parties and rights have accrued under it. *Laidlaw Bros. v. Marrs,* 273 S.W. 789, 791 (Tex.1925). Appellants are legally bound to use appropriated funds for the purpose for which they were appropriated—to pay the rent obligations on the Cross Park Lease and other existing leases. They cannot use that money for "different purposes." Op. Tex. Att'y Gen. No. C-21 (1963) ("Line items in an appropriation bill limit the expenditure of the money appropriated by the line item to the purposes set out in the line item . . ."); Op. Tex. Att'y Gen. Op. No. O-5545 (1943) ("[A]n appropriation of public money for a specific purpose may not be used—drawn from the treasury—

for any purpose other than that specified."). *See also,* Tex. Att'y Gen. Op. Nos. H-207 (1974) and No. M-1191 (1972).

Neither Niles nor any other HHSC or TFC official has the discretion to violate the law and the terms of the Lease. *Houston Belt & Terminal Ry. Co. v. City of Hous.,* 487 S.W.3d 154, 158 (Tex.2016) (A public official has no discretion to violate the law and commits an *ultra vires* act if he or she acts in conflict with the law).[17]

Appellants ignore the fact that the rent due under Cross Park Lease is an expense that HHSC is legally obligated to pay. The Lease was valid. TFC confirmed its validity in 2020 after Cross Park became the landlord. (2 RR, Ex. P-008, Ex. 2 [PDF 2236]). Appellants had no discretion to refuse to honor that obligation unless the Lease was terminated in compliance with the terms of the Lease and applicable law. *Charles Scribner's Sons v. Marrs,* 262 S.W. 722, 727 (Tex. 1924).

An *ultra vires* suit is barred only when an official enjoys absolute and unfettered discretion. *Houston Belt,* 487 S.W.3d at 163. Ordinary discretion when constrained by statutory or regulatory requirements do not bar an *ultra vires* suit. *Id.* Ordinary discretion can be abused, which permits the issuance of extraordinary relief by way of mandamus or injunction. *In re Williams,* 470 S.W.3d 819, 821 (Tex.2015); *Anderson,* 806 S.W.2d at 793.

---

[17] Only the Governor or Legislative Budget Board has the power to redirect funds appropriated for specific purposes but only after finding that an emergency exists. Tex. Gov't Code § 317.002(b). No such emergency existed in this case.

A writ of mandamus can be issued to compel an official to perform legally-imposed ministerial duties necessary for the performance of a valid contract with the State. "[T]he fact that the performance of a ministerial act required by law results in the performance of a contract is no reason why it will not issue. The effect it may have upon the performance of a contract is incidental . . ." *Laidlaw Bros.*, 273 S.W. at 792. *See also, State v. Epperson,* 42 S.W.2d 228, 231 (Tex.1931) (district court authorized "to compel an officer, as agent of the state, to pay over funds to party [who performed services under a valid contract] who claims to be lawfully entitled thereto.").

Appellants cite no authority giving Niles, Novak, or any other official discretion to ignore or nullify the termination procedure mandated by the Cross Park Lease and TFC regulations, to redirect money the Legislature specifically appropriated to pay rent under existing leases to "different purposes," or to refuse to use the money to pay rent due on those leases.

The discretionary power of the State or its agencies to establish the grounds for terminating the Cross Park Lease was exercised when that Lease was made. *Laidlaw Bros.,* 273 S.W. at 792. At that point, rights and obligations under the Lease attached and became fixed. *Id.* at 791. Appellants no longer had the unfettered or absolute discretion "to decide what its obligations are and how it will perform those obligations." *Clear Lake City Water Auth. v. Kirby Lane Development,* 123 S.W.3d

47

735, 750-751 (Tex.App.—Houston [14th Dist.] 2003, pet. denied).

In other words, Appellants had no discretion or power "to undo" those obligations. *Laidlaw Bros.,* 273 S.W. at 792 ("When, by the discretionary action of an executive officer, rights of private parties have become vested, neither he nor his successors in office can annul those rights by undertaking to revoke such action."). The Lease obligations must therefore be honored, unless the Lease is terminated strictly in accordance with the termination provision of the Lease and in compliance with applicable law and regulations.[18]

Adhering to the terms of the Cross Park Lease (and applicable law) are ministerial tasks that are not protected by sovereign immunity. Neither Niles, Novak, nor any other official has the discretion to nullify the State's obligations under the Lease. The Lease could be terminated, but only in accordance with Lease's termination provision and in compliance with TFC regulations—which were not followed, but rather violated.

Appellants' basic argument to avoid the obligations of the Lease is that HHSC has the discretion to deem inactive or to terminate any State lease without any penalty or liability even if legislatively-appropriated funds are available to pay those obligations. But such an interpretation will make it impossible for a private property owner to lease property to any state agency, knowing that the lease can be terminated

---

[18] Termination provisions are disfavored. *Knight v. Chicago Corp.,* 183 S.W.2d 666, 671 (Tex.Civ.App.—San Antonio 1944), *aff'd,* 188 S.W.2d 564 (Tex.1945).

without penalty or liability at any time by a government official in violation of the termination procedures of the lease and applicable law, and in spite of the fact that the Legislature has appropriated funds to pay for the lease.

What the supreme court said in *Charles Scribner's Sons* applies here:

> "Neither is it within the power of a ministerial officer to declare void and refuse to enforce and to comply with a contract that has been duly and officially approved by those authorized and charged by the law to pass upon and to effect its execution. *If it were within the powers of a ministerial officer to question such contracts, on their face regular and valid, chaos in government would soon reign.* Responsibility would not be fixed, and *any employee or agent anywhere along the line of performance could, at his discretion, if the contract did not suit him or his idea of regularity, stop its enforcement. Under such condition no contract could be enforced, and no one would dare contract with the state.* Fixedness of responsibility is a necessity in government." (Emphasis added). 262 S.W. at 728.

*See also, Tex. Tel. Ass'n v. Pub. Util. Comm'n of Tex.*, 653 S.W.3d 227, 253-254 (Tex.App.—Austin 2022, no pet.) (rejecting PUC's argument that it had unfettered discretion to decide whether to pay amounts owed to telecommunication providers under applicable statutory framework, because it would lead to "an absurd result").

1. Novak's and Niles's limited discretion, if any, does not bar the *ultra vires* claim against them.

In *Houston Belt,* the supreme court explained what it means to act "without legal authority." The court wrote that "governmental immunity bars suits complaining of 'an exercise of absolute discretion but not suits complaining of . . . an officer's exercise of judgment or limited discretion without reference to or in

49

conflict with the constraints of the law authorizing the official to act." 487 S.W.3d at 163. In other words, an officer acts without legal authority if he "exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Id.* at 158.

Applying this standard, the supreme court allowed an *ultra vires* claim against a city official to proceed, even though the conduct complained of the official's decision-making authority to determine: (i) what constituted a "benefitted property" and (ii) how much impervious cover existed on the plaintiff's property. *Id.* at 169 ("The railroads' pleadings affirmatively allege that Krueger acted "without legal authority" in both his "benefitted property" and "impervious surface" determinations, and thus they have alleged viable *ultra vires* claims as to each.").

The supreme court explained that only "absolute discretion" will bar an *ultra vires* claim, while decision-making in the context of limited discretion that must comply with applicable laws does not:

> "Thus, 'discretion,' as we have used the term in this context, cannot mean *limited* discretion that is otherwise constrained by the principles of law. Rather, our *ultra vires* caselaw uses the term in its broad sense. Accordingly, the principle arising out of *Heinrich* and its progeny is that governmental immunity bars suits complaining of an exercise of *absolute* discretion *but not suits complaining of either an officer's failure to perform a ministerial act or an officer's exercise of judgment or limited discretion without reference to or in conflict with the constraints of the law authorizing the official to act.* Only when such absolute discretion—free decision-making without any constraints—is granted are *ultra vires* suits absolutely barred. (Emphasis added). *Id.* at 163.

As such, "[a]n *ultra vires* claim based on actions taken 'without legal

50

authority' has two components: (1) authority giving the official some (but not absolute) discretion to act, and (2) conduct either outside of that authority or in conflict with the constraints of law authorizing the official to act. *Tex. Tel. Ass'n*, 653 S.W.3d at 250.

Assuming *arguendo* that Novak and Niles had some limited discretion concerning the termination of the Cross Park Lease, their discretion to act was constrained by the termination procedures of applicable law and of the Lease. Cross Park produced evidence showing that Novak and Niles violated those procedures and thus committed a clear abuse of their limited discretion (if any exists). Such conduct warrants the issuance of mandamus and injunctive relief against them.

2. Forward-looking injunctive relief is proper to address past wrongs.

In *Hartzell*, a university graduate sued to overturn the alleged wrongful revocation of her doctorate degree. 672 S.W.3d at 319. The official-capacity defendant, Hartzell, argued that she could not maintain an *ultra vires* suit against him because she sought "only 'backwards-looking' retrospective relief to rectify an 'already-complete governmental action.'" *Id.* The supreme court disagreed:

> "It is true that ultra vires claimants 'may seek only prospective injunctive remedies.' But that is exactly what K.E. seeks. She asserts that the University officials acted ultra vires in revoking her Ph.D. . . and requests restoration of her degree on a forward-looking basis. If she succeeds on that claim, she is entitled to such relief." *Id.*

As shown above, the attempt made by Niles and Novack to terminate the

51

Cross Park Lease was contrary to law and therefore invalid and of no effect. *Jessen Associates, Inc. v. Bullock,* 531 S.W.2d 593, 598 (Tex.1975). *See also Patel v. Tex. Dep't of Licensing & Regulation,* 469 S.W.3d 69, 76 (Tex.2015) ("[U]nlawful acts of officials are not acts of the State."). The relief that Cross Park seeks is recognition that the Lease remains in effect, which is a proper "forward-looking" or "prospective" remedy to correct Niles's and Novak's unlawful conduct. The trial court is therefore authorized to grant injunctive or mandamus relief compelling Novak and Niles to take all steps required to retract the wrongful termination of the Lease, to treat the Lease as effective and binding on the State, to authorize payments of the rent obligations due under the Lease by the Texas Comptroller, and—if Appellants should again attempt to terminate the Lease before its August 31, 2028 expiration date— to comply with the termination procedures mandated by the Lease and by applicable law. This relief will remove the illegal barriers that Novack and Niles erected to avoid spending the funds that Legislature appropriated to pay HHSC's lease obligations.

3. Injunctive and mandamus relief may require the payment of money.

Sovereign immunity protects the State from lawsuits for money damages. But the fact that an *ultra vires* suit may ultimately result in the payment of money does not violate that principle. *See e.g., Sw. Bell Tel., L.P. v. Emmett,* 459 S.W.3d 578, 589 (Tex.2015) (plaintiff suing county commissioner for *ultra vires* conduct was

entitled to a declaration that would have the effect of requiring the county flood control district to pay the plaintiff money); *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex.2009) ("[S]uits to require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity, even if a declaration to that effect compels the payment of money.").

Cross Park's *ultra vires* claims, if successful, will mean that the Cross Park Lease remains effective, which will obligate the Appellants to make the payment of both accrued rent and rent that will accrue until the Lease expires on August 31, 2028, or is lawfully terminated before that date. *See Jessen,* 531 S.W.2d at 596 (mandamus relief compelling comptroller to "issue a warrant on the State Treasury for $2,590.25 architectural services performed by Relator"); *Carpenter v. Sheppard,* 145 S.W.2d 562, 568 (Tex.1940) (writ of mandamus issued against comptroller directing him to deliver to relator a warrant against the state treasury for his salary and directing the state treasurer to pay the warrant).

Appellants' argument that granting Cross Park such relief will violate the "separation of powers" doctrine is simply another argument in support of Appellants' claim of sovereign immunity. As shown above, Cross Park's claims fall within well-established *exceptions* to the sovereign immunity and thus to separation of powers principles, *i.e.,* (i) the Legislature's *waiver* of immunity under Chapter 114 and (ii) Texas common-law *ultra vires* jurisprudence.

Furthermore, Cross Park's suit in no way violates separation of powers. The suit seeks to *honor* the Legislature's appropriations decisions by ensuring that funds appropriated to HHSC for rents are spent for the precise purpose for which they were appropriated—to pay rent on the State's valid and existing leases.

## CONCLUSION AND PRAYER

For the foregoing reasons, Cross Park prays that this Court affirm the trial court's denial of Appellants' pleas to the jurisdiction and grant Cross Park such other and further relief to which it is entitled.

Respectfully submitted,

| | |
|---|---|
| R. Kemp Kasling | CARDWELL, HART & BENNETT, LLP |
| State Bar No. 11104800 | J. Bruce Bennett |
| Law Offices of R. Kemp Kasling | State Bar No. 02145500 |
| 5806 Mesa Drive, Suite 300 | 807 Brazos, Suite 1001 |
| Austin, Texas 78731 | Austin, Texas 78701 |
| Telephone: (512) 472-6800 | Telephone: 512-322-0011 |
| Facsimile: (512) 472-6823 | Facsimile: 512-322-0808 |
| Email: kkasling@kasling.com | jbb.chblaw@me.com |

By: */s/ R. Kemp Kasling*
R. Kemp Kasling

ATTORNEYS FOR APPELLEE 8317 CROSS PARK, LLC

## CERTIFICATE OF COMPLIANCE WITH RULE 9.4

Pursuant to Tex. R. App. P. 9.4(i)(3), the undersigned certifies this brief complies with the type-volume limitations of Tex. R. App. P. 9.4(i)(2)(B). The brief was prepared using Microsoft Word 2019 (Version 16.46), and according to the program's word count, the brief contains ___ words, exclusive of the exempted portions in Tex. R. App. P. 9.4(i)(1).

By: */s/ R. Kemp Kasling*
R. Kemp Kasling

## CERTIFICATE OF SERVICE

I hereby certify that a correct copy of the foregoing document was served by electronic means on this 7th day of May 2025, to the following counsel of record:

JENNIFER COOK
Assistant Attorney General
General Litigation Division
Office of the Attorney General
P.O. Box 12548/Mail Stop 019-1
Austin, Texas 78711-2548
Tel: (512) 475-4098
Fax: (512) 302-0667
jennifer.cook@oag.texas.gov

Attorney for Appellants State of Texas, acting by and through the Texas Facilities Commission, for and on behalf of the Texas Health and Human Services Commission; The Texas Facilities Commission; Mike Novak, in his Official Capacity as Executive Director of the Texas Facilities Commission; The Texas Health and Human Services Commission; and Rolland Niles in his Official Capacity as Deputy Executive Commissioner for the System Support Services Division of the Texas Health and Human Services Commission.

By: */s/ R. Kemp Kasling*
R. Kemp Kasling

# APPENDIX

| Chapter 271 (Local Governments) (2005) | Chapter 114 (State Agencies) (2013) |
|---|---|
| DEFINITIONS: ... (2)(A) "Contract subject to this subchapter" means: (A) a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity.... | DEFINITIONS. ... (2) "Contract subject to this chapter" means a written contract stating the essential terms of the agreement for providing goods or services to the state agency that is properly executed on behalf of the state agency.... |
| WAIVER OF IMMUNITY TO SUIT FOR CERTAIN CLAIMS. A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter. | WAIVER OF IMMUNITY TO SUIT FOR CERTAIN CLAIMS. A state agency that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this chapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of an express provision of the contract, subject to the terms and conditions of this chapter |
| LIMITATIONS ON ADJUDICATION AWARDS. (a) Except as provided by Subsection (c), the total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter is limited to the following:<br><br>(1) the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration;<br><br>(2) the amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract; | LIMITATIONS ON ADJUDICATION AWARDS. (a)A The total amount of money awarded in an adjudication brought against a state agency for breach of an express provision of a contract subject to this chapter is limited to the following:<br><br>(1) the balance due and owed by the state agency under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration if the contract expressly provides for that compensation;<br><br>(2) the amount owed for written change orders;<br><br>(3) reasonable and necessary attorney 's fees based on an hourly rate that are equitable and just if the contract expressly provides that |

| | |
|---|---|
| (3) reasonable and necessary attorney's fees that are equitable and just; and | recovery of attorney 's fees is available to all parties to the contract; and |
| (4)  interest as allowed by law, including interest as calculated under Chapter 2251, Government Code. | (4) interest at the rate specified by the contract or, if a rate is not specified, the rate for postjudgment interest under Section 304.003(c), Finance Code, but not to exceed 10 percent. |
| (b)  Damages awarded in an adjudication brought against a local governmental entity arising under a contract subject to this subchapter may not include:<br><br>(1)  consequential damages, except as expressly allowed under Subsection (a)(1);<br><br>(2)  exemplary damages; or<br><br>(3)  damages for unabsorbed home office overhead. | (b) Damages awarded in an adjudication brought against a state agency arising under a contract subject to this chapter may not include:<br><br>(1) consequential damages;<br><br>(2) exemplary damages; or<br><br>(3) damages for unabsorbed home office overhead |
| NO WAIVER OF OTHER DEFENSES. This subchapter does not waive a defense or a limitation on damages available to a party to a contract, other than a bar against suit based on sovereign immunity. | NO WAIVER OF OTHER DEFENSES. This chapter does not waive a defense or a limitation on damages available to a party to a contract, other than a bar against suit based on sovereign immunity. |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Mary Cook on behalf of Roy Kasling
Bar No. 11104800
macook@khdalaw.com
Envelope ID: 100556502
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Brief of Appellee 8317 Cross Park LLC
Status as of 5/7/2025 3:21 PM CST

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Victoria Gomez | | victoria.gomez@oag.texas.gov | 5/7/2025 3:14:35 PM | SENT |
| Jennifer Cook | | jennifer.cook@oag.texas.gov | 5/7/2025 3:14:35 PM | SENT |

Associated Case Party: 8317 Cross Park, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Kemp Kasling | | kkasling@kaslinglaw.com | 5/7/2025 3:14:35 PM | SENT |